### CLEMENT B. MITCHELL *vs.* JOHN WALL.

In an action for false imprisonment the judge instructed the jury that probable cause was a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious and prudent man in entertaining an honest belief of guilt; that mere belief occasioned by negligence or want of proper investigation or reflection would be no justification ; that although there was not probable cause, the defendant would not be liable unless he acted maliciously; but that an act done wrongfully and without probable cause in a wanton disregard of the rights of another was malicious. *Held,* that the defendant had no ground of exception.

In an action for false imprisonment the question of probable cause must be submitted to the jury when it rests on conflicting evidence.

TORT. The first count was for malicious arrest and false imprisonment. The second was for slander in charging the plaintiff with larceny. Trial in the Superior Court, before *Putnam,* J., who allowed the following bill of exceptions :

" It was admitted that the plaintiff was innocent of the crime on account of which the arrest was made, the defendant claiming that he had acted in good faith, without malice, and under an honest mistake of identity in causing the arrest and detention, in consequence of a strong resemblance which he alleged the plaintiff bore to a person believed to be guilty of the offence for which the arrest was made.

" It appeared that on March 1, 1871, five days before the arrest, a larceny of a considerable sum of money was committed in the daytime from a money drawer in the defendant's shop in Charlestown ; that shortly before the money was missed, a stranger came into the shop, purchased a cigar, and changed a bill for $20 ; and that about the same time another stranger came round in the rear of the defendant's shop, and attracted his attention by some inquiries concerning a parcel of real estate owned by the defendant. These persons were supposed to have acted in concert, and to have been concerned in the commission of the larceny. One of them was of dark complexion, and according to the testimony of the defendant and two witnesses called by him, who were at the shop and saw and talked with these strangers, this one closely resembled the plaintiff ; but there was a conflict in the testimony of the defendant and these two witnesses as to which of these two strangers bore this resemblance. The two witnesses testified that it was the man who bought the cigar and changed the bill for $20 ; but the defendant testified that that man was of a sandy complexion, and that the man who occupied his attention in the rear of the shop was the dark-complexioned man who resembled the plaintiff ; but, according to the testimony of the defendant and these two witnesses, neither of those strangers had been seen by them before that day.

" Immediately after the larceny, on the same day, the defendant gave a description of one or both these persons at the police station in Charlestown, and also at the office of the chief of police

Mitchell v. Wall.

in Boston. At the Boston office the description was taken down in writing, and was produced and read at the trial. In this description one person only was mentioned, and he was described as of sandy complexion; but the defendant testified that he referred in this description only to the man who bought the cigar, and who, he said, was of sandy complexion, but that he did describe both of the strangers at this office. A witness from the office of the chief of police, who assisted in taking down the description, testified that the defendant then mentioned but one person, and said that this stranger had been hanging round his shop for several weeks previous, or that he had visited his shop frequently during several weeks previous.

" The defendant subsequently, on the same day, gave his description of the two persons whom he saw at his shop at the time of the larceny, to one Maguire, a member of the state police, who testified to the possession of considerable experience as a detective, and was understood by the defendant at the time to be a detective. This officer, as also the Charlestown detective, claimed to know the suspected person or persons from the description given by the defendant to them, and each told the defendant that the dark-complexioned man was well known to them, and had recently served out a term in the state prison, and Maguire added that he lived with a woman in the vicinity of Cambridge Street; that he had just got off a sick bed to commit this larceny; that he was the smartest thief in the State; and that he had many friends who would bail him as soon as he should be arrested. The testimony of the description which the defendant gave to these officers, and of their replies predicated upon such description as above stated, was admitted against the objection of the plaintiff.

" On the day of the plaintiff's arrest, the defendant saw him about noon near Dock Square in Boston, and supposing him to be one of the persons concerned in the larceny, went in search of Maguire, and, failing to find him, returned and followed the plaintiff until he stopped in conversation with a friend, at or in front of a shop in Dock Square. There the defendant accosted a police officer, and told him that he identified the plaintiff as the

man who had a few days before bought a cigar at his shop, changed a bill for $20 and robbed his till; and requested the officer to arrest the plaintiff, which the officer did. Upon being requested by the officer, the plaintiff walked with him to the police station in Boston, the defendant accompanying them. Upon reaching the police station, the defendant repeated his statement made to the officer in Dock Square to the captain in charge of the station, adding that the plaintiff was a smart thief, and that a description of him would be found in the office of the chief of police, which he had left there.

" The police captain testified that he examined this written description, noticed the discrepancy between it and the appearance of the plaintiff, who was very dark, and had a large, heavy, black moustache; that at the request of the plaintiff, he sent for two of the plaintiff's friends, who were well known to the police captain; that these citizens represented the plaintiff to be a respectable citizen well known to them, and earnestly solicited the defendant to enter into an examination and investigation; that the defendant declined to answer questions concerning the charge against the plaintiff, except to state the charge on which he was arrested; that on being asked to examine and investigate the matter, he answered that he was not at liberty to answer questions, but reiterated his statements that he 'knew his man,' that he 'was sure of his man,' and that the plaintiff 'was the smartest thief in the State.' The police captain also assured the defendant that the friends of the plaintiff were known to him to be reliable men, called the defendant's attention to the growth of the plaintiff's moustache, as being very large for a man just out of the state prison, told the defendant that he was satisfied it was a case of mistaken identity, and declined to send his officers with the plaintiff to Charlestown. The police captain testified that the defendant told him that there was a warrant for the arrest of the plaintiff in Charlestown, and the captain told him he must go to Charlestown, and get officers from that place to take him there.

" The plaintiff was detained at the Boston office until the defendant went to Charlestown and returned with officers for his arrest

The plaintiff was then taken to Charlestown by two officers from that place, accompanied by the defendant, but was treated respectfully during his removal. On his arrival at Charlestown he was put into a cell at the police station, searched, and his money and watch taken from him, and the defendant then repeated the statements above stated. A short time afterwards the plaintiff's friends arrived at Charlestown, and one of them being known to the officer in charge as a respectable citizen, by order of this officer the plaintiff was removed from the cell, and permitted to sit in the office of the city marshal. Here the two witnesses who saw the strangers at the time of the larceny were called in by the defendant to identify the plaintiff; one of them testified that he had a full view of the plaintiff within a few feet from him and said to the defendant, ' He is not the man.' The other testified that he had an imperfect or side view of the plaintiff, looking from the hall into the office where the plaintiff sat; and he told the defendant he thought he was the man. It did not appear that this witness was prevented in any way from making a closer observation of the plaintiff at this time, nor did it expressly appear that the defendant knew that this witness did not have a full examination or view of the plaintiff.

" Some of the officers called the attention of the defendant again to the growth of the plaintiff's moustache in connection with his alleged recent release from the state prison. The captain also communicated to the defendant his personal knowledge of the respectability of the plaintiff's friends; but the defendant persisted in saying that he knew his man, and that he would rather give $10,000 than have him get away. Towards night the plaintiff's friends procured bail for his appearance next morning, and he was released. After his release there was evidence that the witness who thought he recognized the plaintiff as one of the strangers present when the larceny was committed, returned to the station at the defendant's request to make another and fuller examination, but the plaintiff had been released. On the next morning the plaintiff appeared, but no complaint was made against him, and the defendant's witnesses, upon further examination, being then satisfied that they were mistaken, the

plaintiff was discharged on the request of the defendant, without examination or trial; no warrant for his arrest was ever issued.

"No verbatim report of the testimony was made, and there were many fragments of conversation, statements of the parties, and circumstances testified to, from which the plaintiff's counsel argued that the defendant acted with a wanton and reckless disregard of the plaintiff's rights, and refused to make proper inquiry; and from which also the defendant's counsel argued that the arrest was occasioned by an honest mistake of identity, and upon a justifiable and reasonable suspicion; but the substantial facts materially affecting the issues tried, are herein reported.

"Very full instructions were given to the jury upon numerous prayers for such instructions by the defendant; among such prayers were the following: 'The burden is upon the plaintiff to prove, by a preponderance of evidence, that the defendant was actuated solely by a malicious and evil intent to injure the plaintiff, or subject him to inconvenience and disgrace by causing him to be arrested, and did not have reasonable cause to believe him guilty of the offence with which he was charged, and upon which he was arrested. Probable cause is such a state of facts in the mind of the prosecutor as would lead a man of ordinary caution and prudence to entertain an honest and strong suspicion that the person accused is guilty. The uncontroverted facts appearing in evidence show that the defendant had probable cause to suspect the plaintiff guilty of the offence upon which he was arrested, and justifies such arrest, and the detention and consequences of such arrest.'

"Upon the matters embraced in these prayers for instructions, the judge, instead of giving those instructions, instructed the jury substantially, that the plaintiff must satisfy them, by a preponderance of the evidence, (1,) that there was no probable cause for the arrest, on the part of the defendant, and (2,) that it was done maliciously; that 'probable cause' was a reasonable ground of suspicion of guilt, supported by circumstances sufficiently strong in themselves to warrant a cautious and prudent man in entertaining an honest belief that a party is guilty; that if the defendant acted upon such information as would induce a reasonably

prudent man to believe the plaintiff guilty, he was not liable, whatever might have been his personal motives ;· that the ques- tion of probable cause did not turn on the actual innocence or guilt of the party, but upon the defendant's belief at the time, upon reasonable grounds ; that mere belief occasioned by the defendant's own negligence, or want of proper investigation, or reflection, would be no justification to him ; that if the facts fell short of a legal measure of probable cause, and the defendant was honest in his error and acted in good faith, and from a sense of supposed duty, he would not be liable ; that it must therefore be shown that he acted maliciously ; that malice in its legal sense meant any improper and sinister motive, not necessarily spite and hatred to the plaintiff ; that the act need not have been prompted by malevolence or any corrupt design towards the plaintiff ; that an act done wrongfully and without reasonable and probable cause in a wanton disregard of the rights of another was malicious in law ; and therefore, if they found that the defendant had acted in this case without probable cause, they might infer malice on his part ; but that this inference might be rebutted by any circum- stances which showed that the defendant's purpose was a fair and honest one."

The other instructions given were not excepted to.

The jury returned a verdict for the plaintiff for $1500 damages on the first count, and $500 damages on the second count. The defendant alleged exceptions to the refusal to give the instruc- tions in terms as prayed for, and to the instructions given instead thereof.

*H. W. Bragg,* for the defendant.

*A. Russ,* for the plaintiff.

AMES, J. The instructions given to the jury were correct, and leave to the defendant no ground of complaint. The jury were told that the plaintiff must satisfy them that there was no prob- able cause for the arrest on the part of the defendant, and that the act was done maliciously. The definitions given of " probable cause," and of " malice," were such as have received the repeated sanction of this court, and of many others. *Bacon* v. *Towne,* 4 Cush. 217. *Stone* v. *Crocker,* 24 Pick. 81. *Wilder* v. *Holden,* Ib. 8. *Munns* v. *Dupont,* 3 Wash. C. C. 31.

Whether there was probable cause, in cases of this kind, is a question of law upon the evidence, provided the facts are ascertained. But where the evidence is contradictory, the court will submit the question to the jury, with instructions adapted to the facts which they shall find to be proved. *Kidder* v. *Parkhurst*, 3 Allen, 393. The defendant justifies his proceedings on the ground of an honest mistake, resulting from an alleged strong personal resemblance between the plaintiff and the real offender. But the existence of any such resemblance was a controverted fact. There was evidence also which had some tendency to show that such information was furnished as to the plaintiff's general good character, and that such circumstances were pointed out as to his personal appearance, as to render it doubtful, as a matter of fact, whether the defendant was acting upon such reasonable grounds of belief as to justify him for the purposes of this trial, or whether, on the other hand, his conduct was reckless, unreasonable, and without probable cause. This was a question of fact, and was submitted to the jury with proper instructions.

*Exceptions overruled.*