## STAUNTON et al. v. GOSHORN.

(Circuit Court of Appeals, Fourth Circuit. May 2, 1899.)

No. 295.

1. MALICIOUS PROSECUTION—PROBABLE CAUSE.

In an action for malicious prosecution, defendants are not liable, no matter how vindictive they may have acted, nor what their motives may have been, if they acted with probable cause.

2. SAME—QUESTION FOR COURT.

Whether or not there was probable cause for the institution of a criminal proceeding, where the facts are undisputed, is a question of law for the court; otherwise, one of fact for the jury.

3. SAME—EVIDENCE.

The evidence showed that certain public officials in charge of the public records of the court and the sheriff of the county were informed, by a deputy clerk, that a former clerk was about to steal certain public records and destroy them, with an intent to prejudice such officials by showing payments made without proper vouchers, and that on a certain day he would carry his purpose into effect. On such day the former clerk was discovered by the officials removing such records from the clerk's office, and thereupon they procured his arrest. *Held* that, in an action by such clerk for malicious prosecution, the jury should have been instructed that there existed, so far as the public officials were concerned, probable cause for the institution of the criminal proceedings.

4. SAME.

A former clerk was arrested on a charge of stealing public records with intent to destroy them, but defended on the ground that his purpose was simply to examine the same in order to ascertain their validity. Certain public officials had been informed by a deputy clerk of the intent of such former clerk to steal the papers, and, on finding him in possession of the papers, caused his arrest. *Held*, in an action against such officials and the deputy clerk for malicious prosecution, it was error to instruct the jury that if the purpose of such former clerk in taking the papers was to examine them, and not to destroy them, and the person giving the information to the public officials had knowledge of such intent, that the arrest and prosecution of such clerk for taking the papers was without probable cause, in that it made no distinction between the public officials and the deputy clerk, as such public officials had no knowledge of the facts other than as communicated to them by said deputy clerk.

5. SAME—RES JUDICATA.

Where an indictment for stealing certain road orders from the office of the clerk of court was sustained on demurrer, and the accused tried thereunder and acquitted, in a subsequent action for malicious prosecution accused cannot claim that the prosecution was instituted without probable cause, because the road orders were not subjects of larceny, as the judgment of the criminal court was binding and valid on the questions necessarily involved in the maintenance of the indictment, to wit, that a criminal offense was charged.

6. SAME—ADVICE OF ATTORNEYS.

The advice of reputable counsel, bona fide sought and given on full and fair statement' of all the facts, and as a consequence of which a prosecution was instituted, is a sufficient defense in a suit for malicious prosecution.

7. SAME.

On a trial for malicious prosecution, the defense that defendants acted under the advice of attorneys may be sustained, though the advice was taken after the arrest, but before the issuance of the warrant.

8. SAME—EVIDENCE.

On a trial of several defendants for malicious prosecution in procuring the trial of plaintiff for stealing public records, plaintiff could not

prove statements made by him to third parties before the taking of the papers, as to what were his objects and purpose in procuring such papers, such evidence being hearsay.

## In Error to the Circuit Court of the United States for the District of West Virginia.

This is a writ of error to the judgment of the circuit court of the United States for the district of West Virginia, rendered on the 11th of August, 1898, in an action for malicious prosecution pending in said court, wherein the defendant in error here was plaintiff, and the plaintiffs in error were defendants. The case grew out of a criminal prosecution in the criminal court of Kanawha county, W. Va., against the defendant in error inaugurated under the following circumstances:

J. W. Goshorn, defendant in error, had been for two terms, of six years each, expiring on the 1st of January, 1897, clerk of the county court of Kanawha county, in the state of West Virginia. On the said 1st day of January, 1897, E. W. Staunton succeeded him as clerk for the term of six years, having been elected at the preceding election. The plaintiff in error Peter Silman was sheriff of the said county from the 1st day of January, 1893, to the 1st of January, 1897. The plaintiff in error John A. Jarret, on the 1st of January, 1897, became the chief deputy clerk of the said E. W. Staunton; and plaintiff in error Robert A. Coleman, who had been, for several years prior and up to the expiration of his last term of office, deputy clerk for defendant in error, Goshorn, continued to act as such deputy clerk for Staunton, Goshorn's successor. The defendant in error, J. W. Goshorn, and the plaintiffs in error Staunton, Silman, and Jarret, were unfriendly to each other, growing out of a political feud theretofore existing in the said county. During the week preceding the 23d of November, 1897, the day on which defendant in error was arrested, plaintiff in error Robert A. Coleman informed his principal, Staunton, and said Jarret and Silman, that the defendant in error, Goshorn, had had several conversations with him in reference to getting from the clerk's office certain road orders, allowed by the county court of said county to Silman in the settlement of his accounts as sheriff, in which he said that, if he could get hold of these papers, he would then have the newspapers make an investigation, and publish the fact that there were no vouchers for the allowance in question, which would create a great stir, and get the county court, Silman, and Staunton into trouble; and that he had proposed to him (Coleman) to take the road orders out of the clerk's office, and that he (Goshorn) would destroy them. Upon receiving this information, Staunton, Silman, and Jarret determined to lay a trap to catch Goshorn, if he took the papers, and told Coleman that he could make a proposition of some kind to him, so that, if he desired to get the road orders, he would have an opportunity to do so.

On Saturday morning before the arrest of the defendant in error, Coleman had another conversation with him, in which Goshorn, as testified to by Coleman, again renewed the proposition to take the papers from the office, and Coleman told him that he would go to the extent of placing the road orders where he (Goshorn) could get them; whereupon Goshorn requested Coleman to place them in the fourth box of a certain row of tin boxes in the record room of the clerk's office, and have them there on the following Tuesday at noon, and that he would take the papers when Chief Deputy Clerk Jarret left the clerk's office for dinner, to which Coleman agreed. On the same evening Coleman informed Staunton and Silman of what had occurred, and of Goshorn's purpose to take the papers out of the clerk's office on the following Tuesday, and Staunton and Silman told Coleman that they would make an arrangement so that Goshorn would not be able to get away with the papers. The orders in question were placed in the tin box by Coleman, in the presence of Jarret, about half past 11 o'clock on Tuesday morning, the 23d of November, 1897. About noon, almost immediately after Jarret had left the clerk's office for dinner, according to the evidence of the plaintiffs in error, Goshorn, who had been talking with the deputy sheriff, Harlis, near the side entrance to the court house, went into the record room, got the papers, and

left the building. Coleman was not in the room when he got the papers, and did not give them to him. Shortly after leaving the building, Goshorn met plaintiff in error Silman, and returned to the clerk's office with him, in reference to the purchase of a lot of land; but before his return Jarret came back to the office, went into the record room, and found that the papers were gone from the box in which they had been placed. Goshorn, after examining the records with Silman for a short while, and before the examination was completed, asked Silman to excuse him, as he desired to go into the water-closet; that he left the record room, went into the middle office, and, as he started to enter the water-closet, Deputy Clerk Jarret accosted him, and said that he had missed some papers from the clerk's office; whereupon Goshorn took the papers from his pocket, and explained that they were some papers which Deputy Clerk Coleman had given him; and thereupon Silman and Jarret instructed the sheriff and his deputies, who were present, to arrest him, and he was taken into custody by them.

The testimony of the plaintiffs in error further shows that the purpose of Staunton and Jarret was to protect these road orders and other papers in the clerk's office by catching the person who had an intent to take them unlawfully and for illegal purposes, and that the purpose of Silman was to protect the vouchers on which the drafts had been issued to him; that they acted in good faith in all that they did, believed Coleman's statements, and that the time and circumstances under which defendant in error, Goshorn, took the papers corresponded with the information given to them by Coleman on the previous Saturday. Plaintiffs in error Staunton, Silman, and Jarret so testified as to their purpose and motives in what they did, and as to the information imparted to them by Coleman of Goshorn's purpose to secure the papers, his intention to destroy them, and his plan of securing them. They further testified that they believed Coleman's statements, and acted in good faith in all that they did. Coleman corroborated the statements of the plaintiffs in error, and further testified as to his interviews with Goshorn, as above mentioned. That the defendant in error never had any conversation or arrangement to get the papers or road orders with any of the plaintiffs in error except Coleman, and did not know of the fact that Coleman had communicated to his co-plaintiffs in error his (Goshorn's) purpose and plan to take the papers, nor did he know of the arrangement that had been made to entrap him, and in the entire dealing nothing occurred between Goshorn and any of the plaintiffs in error except Coleman. That Coleman did not know of the purpose to have defendant in error arrested if he took the papers, and did not know what steps would be taken to prevent Goshorn from getting away with or destroying the papers if taken.

The defendant in error, Goshorn, testified, in substance, that during the said week preceding the 23d of November, 1897, he met plaintiff in error Coleman on the street, and in conversation stated that the county court had only allowed him $1,500 for making out the land books, when it had allowed Staunton $1,800 for doing the same work, and inquired of Coleman why he had not told him of it, to which Coleman replied that he had not thought of it. Goshorn then said that he would sue the county court and expose some of its rascality. That Coleman then stated that the county court had allowed certain road orders to Peter Silman illegally, having paid some of them out of the bridge fund, and some of them were issued to persons claiming to be road surveyors when, in fact, they were not, and he (Goshorn) ought to get them and examine them. That subsequently, during the same week, Coleman again spoke to him, telling him of the action of the court, and urged him to get the road orders and examine them; whereupon he (Goshorn) told him that, if he would get them and give them to him, he would examine them. That on Saturday of the same week Coleman again mentioned to him the action of the county court in respect to these road orders, and urged him to examine them, and told him that he would get them for him in order that he might make the examination. That he replied that he was going out of town, but would be back on the following Tuesday, and that if he would then get them he would examine them, and, upon finding that they had been improperly allowed, he would give the facts to the press, and have them published for the information of the public. That in the last conversation, desiring to

have some conveyances made, he requested Coleman to copy some deeds for him in the clerk's office, which he agreed to do. That on Tuesday morning he met Coleman on the street, went with him to the clerk's office, Coleman explaining that he had not made the copies of the deeds, but would do so that morning. On the way to the court house Coleman told him that he could get the road orders and give them to him to be examined, but that he (Goshorn) stated that he could not make the examination in the court house, and would have to take them outside, for the reason that persons in the court house would watch him and prevent him from making an examination there. That after he went to the clerk's office, and had examined the records about another matter, and while his brother, Ernest Goshorn, was present in the record room, Coleman came to him, and told him that he had placed the road orders in a file box in the record room, where he could get them, but he refused to take them from the box, and told Coleman that he must get them himself and give them to him, which he did in the presence of said Ernest Goshorn, his brother. That he then put the papers in his pocket, went out of the office, started across to the newspaper office for the purpose of making the examination of the papers, where he met the plaintiff in error Silman, and returned with him to the clerk's office in reference to the purchase of a piece of property above mentioned, when he was accused of taking the papers, and placed in the custody of the sheriff, as before stated.

After the defendant in error. Goshorn, had been taken into the custody of the sheriff, he was taken by him before H. M. Bond, a justice of the peace, in a different part of the city, and there detained for nearly three hours before any warrant was issued against or served upon him.

The plaintiffs in error, other than said Coleman, immediately after Goshorn had thus been taken in custody, consulted with S. C. Burdette, then assistant United States district attorney, who had been formerly prosecuting attorney of Kanawha county, a lawyer of more than 15 years' experience, of high standing as a criminal lawyer, and the father of F. C. Burdette, then prosecuting attorney of said Kanawha county, and who frequently assisted his son in prosecutions in the state courts. That they explained to him all the facts relative to the matter, and all the circumstances leading up to Goshorn's arrest, including the plan arranged to catch him, and the information received by them from Coleman, before and after the plan was actually arranged, and asked said Burdette for advice in the matter. That thereupon he advised them that Goshorn should be prosecuted, and himself drafted and wrote the complaint, which was sworn to by plaintiff in error John A. Jarret, before said H. M. Bond, justice of the peace, before whom Goshorn had been taken, who thereupon issued the warrant for his arrest, charging him with the theft of the aforesaid orders and warrants on file in the said clerk's office, alleged to be of the value of $2,300, and the property of said Staunton, clerk as aforesaid, and the said Silman, late sheriff as aforesaid, and certain other persons whose names were unknown. Said Goshorn was thereupon arrested under the warrants so sworn out against him, and, after an examination of his case before the justice, was bailed for his appearance before the grand jury of the criminal court of Kanawha county to answer of and concerning the charges made against him. That on the 7th of January, 1898, Goshorn was indicted by the grand jury of the criminal court of Kanawha county for the offenses alleged against him, the prosecuting attorney, F. C. Burdette, conducting the examination before the grand jury which found the indictment. And he was subsequently, a demurrer to the indictment and each count thereof being overruled, tried in said court under said indictment, which trial resulted in an acquittal, on the 15th of February, 1898; whereupon this suit, on the 21st day of the same month, was instituted in the circuit court of the United States for the district of West Virginia, the defendant in error here, Goshorn, then being a resident of the state of New York.

Geo. E. Price and Malcolm Jackson (Flournoy, Price & Smith and Brown, Jackson & Knight, on the brief), for plaintiffs in error.

J. W. Kennedy (J. W. St. Clair, on the brief), for defendant in error.

Before GOFF, Circuit Judge, and MORRIS and WADDILL, District Judges.

WADDILL, District Judge (after stating the facts as above). The assignments of error are 34 in number, but, in the view this court takes of the case, it will not be necessary to pass upon all of them. The exceptions were taken mainly to the court's action in granting and refusing certain instructions, and amending others asked for by plaintiffs in error. The instructions, 24 in number, covered many difficult questions and various phases of the case. Five were given at the instance of defendant in error, 8 at the instance of the plaintiffs in error, the court amending, however, 2 of theirs, and rejecting altogether 10 others offered by them, and gave 11 instructions of its own.

It will be necessary to keep well in view just what the law is governing cases of this character. In order for the defendant in error to have maintained his suit, it was necessary for him to prove: (1) The existence of the prosecution, and the fact that plaintiffs in error were the prosecutors or instigators of the same; (2) that it finally terminated in his acquittal; (3) that it was instituted without reasonable or probable cause; and (4) that the plaintiffs in error were actuated by legal malice,—that is, improper or sinister motives; and that these four elements concurred.

· It was not enough to establish that the prosecution complained of was instigated by the plaintiffs in error, and the proceedings instituted by them with malice and ill will towards defendant in error. It was necessary that the defendant in error should have gone a step further, and shown that there was no probable cause for the inauguration of the prosecution. If plaintiffs in error acted with probable cause, they were not liable in an action for malicious prosecution, it matters not how vindictively they may have acted or what their motives may have been. Wheeler v. Nesbitt, 24 How. 544, 550; Stewart v. Sonneborn, 98 U. S. 187, 192, 194, 195; Crescent City Live-Stock Co. v. Butchers' Union S. H. Co., 120 U. S. 141, 148, 149, 7 Sup. Ct. 472; Sanders v. Palmer, 14 U. S. App. 297, 307, 5 C. C. A. 77, and 55 Fed. 217; Munns v. De Nemours, 3 Wash. C. C. 31, Fed. Cas. No. 9,926; Scott v. Shelor, 28 Grat. 891, 899; Mitchell v. Wall, 111 Mass. 492; Howard v. Thompson, 1 Am. Lead. Cas. 200, 213; 1 Hil. Torts, c. 16, § 18.

It must also be borne in mind that from the evidence in this case plaintiffs in error Staunton, Silman, and Jarret did not occupy the same position as the plaintiff in error Coleman. They claim to have acted solely upon what Coleman told them, and defendant in error conceded that he talked with Coleman alone in reference to the papers alleged to have been stolen. There was no evidence that he had any conversation with any of the plaintiffs in error except Coleman, and Coleman fully corroborated his co-plaintiffs in error, and testified that he communicated to them the fact that defendant in error desired to examine and take the papers in question for the purpose of destroying and making away with them, and said plaintiffs in error Staunton, Jarret, and Silman,

one and all, testified that in all did they acted in good faith and upon the information received from Coleman; Staunton and Jarret swearing that their purpose was to preserve and protect the public records in their custody, and Silman that his was to prevent the destruction of his vouchers.

The purpose and intent with which plaintiffs in error acted was most material, as bearing upon the question of probable cause; for, while malice may be inferred from the absence of probable cause, still the lack of probable cause would not be presumed because of the existence of malice. Whether or not there is probable cause for the institution of a criminal proceeding is sometimes a question of law and sometimes a question of fact. Where the facts are undisputed it is a question of law, and should be determined by the court; otherwise, it is one of fact and for the jury. Crescent City Live-Stock Co. v. Butchers' Union S. H. Co., 120 U. S. 141, 149, 7 Sup. Ct. 472; Stewart v. Sonneborn, 98 U. S. 187, 194; Sanders v. Palmer, 14 U. S. App. 308, 309, 5 C. C. A. 77, and 55 Fed. 217; Knight v. Railway Co., 9 C. C. A. 376, and 61 Fed. 87, 91.

It seems to us, upon the facts and evidence as certified in the record, there was no dispute as to why, and the circumstances under which, the plaintiffs in error Staunton, Silman, and Jarret acted. They and their co-plaintiff in error Coleman fully corroborated each other in every particular. Indeed, the only conflict was as to what occurred between defendant in error, Goshorn, and Coleman, of which Staunton, Silman, and Jarret had no knowledge, other than as communicated to them by Coleman, and what occurred at the time the papers were taken out of the box in the clerk's office. Goshorn's claim was that Coleman took the papers and gave them to him in the presence of his (Goshorn's) brother, whereas the evidence of the plaintiffs in error was that Goshorn took the papers out of the box himself, and that Coleman was not in the record room at all. Upon this state of facts, there being really no conflict in the evidence as to Staunton's, Silman's, and Jarret's connection with the institution of the criminal prosecution, and of the circumstances under which they acted, the jury should have been instructed that there existed, so far as they were concerned, probable cause for the institution of the criminal proceedings, and that the defendant in error, Goshorn, could not recover against them.

Staunton and Jarret were each public officials, in charge of the public records of the court, one as clerk and the other as deputy clerk of the county court of Kanawha county, and Silman was, as late sheriff, interested personally in preserving the public records, which contained his vouchers used in settlement with the county officially. They all testified that they were reliably informed of the purpose of defendant in error to steal the public records; that they believed the information they received, and watched to see if the records would be taken, as they had been advised they would be, and, seeing the supposed theft, they immediately caused defendant in error to be held until they could consult counsel as to the propriety of swearing out the warrant, and that, upon such advice, they caused the warrant to issue. What less,

as honorable officers, could they have done? And as to all this it is to be borne in mind that there was, so far as they were concerned, apparently no conflict in the evidence, except as to the single question whether Goshorn himself took the papers from the box before starting away with them or whether Coleman handed them to him. Whatever may have been his purpose and motive in procuring the papers, or whether he had been deceived or misled by Coleman, were matters of which they, according to the undisputed evidence in the record, were in total ignorance, except as advised by Coleman, whom they believed.

The answer of the defendant in error to all this was that the case was one in which the charge of conspiracy was made; that Coleman, Staunton, Silman, and Jarret were all conspirators, and therefore bound by the acts of each other, and they each stood, so far as defendant in error was concerned, in exactly the same position. This assumes that a charge of conspiracy is all that is necessary, which is not true. It must be followed by proof, and that proof must be sufficient to connect all of the alleged conspirators with the original unlawful design before the separate act of one can be imputed to them all, and proof of this appears to us to be utterly lacking in this case.

Among the instructions given by the lower court were the following, being No. 4, offered by the defendant in error, and the court's No. 9:

"No. 4. The court instructs the jury that if they believe from the evidence that the purpose and object of the plaintiff, in getting possession of the said road orders in controversy in this suit, was to examine them, in order that he might ascertain their validity or integrity, and not to destroy them, and that the defendant Coleman was made acquainted with such intention and purpose on the part of the plaintiff before he came in possession of said orders, then the arrest and prosecution of the plaintiff for the felonious taking of such orders was without probable cause, and the jury should so find."

"No. 9. The court instructs the jury that if they find from the evidence that the defendants Silman, Staunton, and Jarret, through defendant R. A. Coleman, placed the county orders mentioned in this suit where the plaintiff could get them, and that it was arranged by Coleman on behalf of the defendants with the plaintiff in this action that they would be placed in a certain box in the clerk's office, and that they were so placed, and that the plaintiff was informed by Coleman where the papers were, and that he could get them, and that the defendants Staunton, Silman, and Jarret agreed with Coleman that they should be so placed, then, under such circumstances, the taking of such orders was not larceny; and if the jury further believe from the evidence that the plaintiff was arrested and prosecuted for such taking, then no probable cause existed for such prosecution."

These two instructions seem to us erroneous, and clearly calculated to mislead the jury, to the prejudice of the plaintiffs in error Staunton, Silman, and Jarret, in any view that may be taken of the case. In instruction No. 4, the jury were told that if the purpose of Goshorn in taking the road orders in question was to examine them to ascertain their validity, and not to destroy them, and that plaintiff in error Coleman was acquainted with such intention on his part before Goshorn came in possession of said papers, then that the arrest and prosecution of defendant in error was without probable cause, and they should so find. The instruction is fatally defective, in that

it makes no distinction between plaintiffs in error Coleman, Staunton, Silman, and Jarret, and charges Coleman's co-plaintiffs in error with knowledge of facts communicated to him alone.

The court's instruction No. 9 is subject to the same objection in part as No. 4. It leaves out of view entirely the question of whether or not plaintiffs in error Staunton, Silman, and Jarret acted in good faith in what they did, and the purpose and intent with which defendant in error, Goshorn, acted in what he did. It practically takes the case away from the jury on these two questions, and seems clearly erroneous when read in connection with court's instructions Nos. 8 and 10, which immediately precede and follow it, as follows:

"No. 8. The court instructs the jury that the county orders given in the evidence in this case having been paid off and satisfied, and having no actual value, but being simply papers filed in the clerk's office of the court, are not in law subjects of larceny."

"No. 10. The court instructs the jury that if the papers were taken as set out and described in the court's eighth instruction, and that there was no such value in the papers as would induce the plaintiff to steal them, then this fact is a potential fact, tending to show a want of probable cause."

By instruction No. 8, it will be seen that the court told the jury that these road orders were not the subject of larceny, and by the ninth instruction that if they were taken, as therein stated, the taking of them was not larceny, and that no probable cause existed for the prosecution. By court's instruction No. 10 the jury were told that if the papers were such as the court referred to in its instruction No. 8, and there was no such value in them as would induce the defendant in error to steal them, then that was a potential fact tending to show a want of probable cause.

Aside from the last-named instruction being argumentative, we think the whole theory of these three instructions,—Nos. 8, 9, and 10,—in so far as they deal with the question of the value of the road orders, and their not being the subject of larceny, was erroneous, and that they should not have been given. The action of the criminal court of Kanawha county, W. Va., on this question, of whether or not these papers were the subject of larceny, is binding upon this court in a suit for malicious prosecution, based upon the existence of that case. That court passed upon the validity of the indictment found by the grand jury against the defendant in error, overruling the demurrer thereto and to each count thereof, and expressly refused to charge the jury that said road orders were not the subject of larceny. Under that indictment defendant in error was tried. Upon a conviction thereunder by the jury, that decision, until reversed and set aside by an appellate court, would have been conclusive against the defendant therein, as it would have been conclusive in an action for malicious prosecution growing out of its institution. Such conviction, however, was not had, and the defendant in error was acquitted; but the judgment of the court is none the less binding and valid upon the questions necessarily involved in the maintenance of the indictment, to wit, that a criminal offense was charged. Such decision is entitled to full force and effect everywhere, and to be recognized in all proceedings growing out of, arising under, or dependent upon the existence of that case, and to it should be given due effect,

under the constitution and laws of the United States. The rule has respect to the court and its judgment, and not to the parties. The case was one within its jurisdiction, and it is conclusively presumed, in the absence of fraud, to have acted impartially and honestly, and its judgment, rendered under such circumstances, imports verity. Any departure from this principle would go far to destroy the integrity and value of the judicial system. Dupasseur v. Rochereau, 21 Wall. 135; Embry v. Palmer, 107 U. S. 3, 2 Sup. Ct. 25; Crescent City Live-Stock Co. v. Butchers' Union S. H. Co., 120 U. S. 146, 147, 159, 7 Sup. Ct. 472.

Several of the assignments of error involve the question of how far the fact that the plaintiffs in error Staunton, Jarret, and Silman consulted counsel before swearing out the warrant against the defendant in error, and acted upon such advice, served to relieve them from liability in this action. The court gave two instructions bearing upon this question, and rejected two offered by the plaintiffs in error; and while the exceptions and assignments of error relate to the rejection of the two instructions offered and the giving of the two by the court, the said assignments are more particularly directed at the limitation the court made in the instruction on this question as to the time when counsel was consulted than to the terms in which the instructions were couched. The court emphasized the fact that consulting counsel, after the defendant in error, Goshorn, was placed in the custody of the sheriff, and before the swearing out of the warrants against him, some hours later, would not avail as a defense, and should not be considered in determining whether probable cause existed or not at the commencement of the proceedings; and by another instruction, offered by defendant in error, the court instructed the jury "that the prosecution of the plaintiff, as alleged in the declaration, began with his arrest in the clerk's office." That the advice of reputable counsel, bona fide sought, and given upon full and fair statement of all the facts and circumstances, and as a consequence of which a prosecution was instituted, will serve as a defense in a suit for malicious prosecution, seems to be too well settled to admit of serious contention. Stewart v. Sonneborn, 98 U. S. 187; Sanders v. Palmer, 14 U. S. App. 297, 5 C. C. A. 77, and 55 Fed. 217; Forbes v. Hagman, 75 Va. 168. This is what was done in this case. The evidence is that the lawyer consulted was of very high standing, a former prosecuting attorney for the county, the father of the then prosecuting attorney, who frequently assisted his son in prosecutions, and who was himself the assistant United States attorney for the state; that plaintiffs in error Staunton, Silman, and Jarret "explained to him all the facts relative to the matter, and all the circumstances leading to Goshorn's arrest, including the plan arranged to catch him, and the information received by them from Coleman, both before and after the plan was arranged," and asked for his advice in the premises; that he advised them that Goshorn should be arrested, and drafted the warrant himself. Was this advice given too late, as held by the lower court? There was no count in the declaration for false imprisonment. The suit was one solely of malicious prosecution, and we think that the advice taken before the issuance of the warrant

was sufficient. If false imprisonment had also been charged, the rule would, of course, be different. The test is whether a suit for false imprisonment could be maintained for the arrest made in the clerk's office in this case before the issuance of the warrant. Manifestly it could. Such arrest was extrajudicial, without legal process, and it is false imprisonment, as distinguished from malicious prosecution. How. Mal. Pros. 8; Murphy v. Martin, 58 Wis. 278, 16 N. W. 603; Colter v. Lower, 35 Ind. 285; Lewin v. Uzuber, 65 Md. 341, 344, 4 Atl. 285.

Another of the assignments of error relates to the admission of evidence during the trial, as set forth in the bill of exceptions No. 2; the question being whether defendant in error, Goshorn, could prove by a witness the statements made by Goshorn to the witness on Sunday or Monday preceding the Tuesday on which the papers were taken, with regard to what was his (Goshorn's) object and purpose in procuring the papers. This evidence was admitted, and we think improperly, against the objection of the plaintiffs in error. Whether such evidence might possibly have been introduced in a criminal prosecution it is unnecessary to decide, but manifestly in this case, upon a plea of not guilty, it had no place. The issue joined was not whether defendant in error was guilty of the crime alleged against him, but whether plaintiffs in error had probable cause to believe at the time, and under the circumstances that they acted, that he was guilty. So far as they were concerned, if for no other reason, it should have been excluded as hearsay evidence. There is no pretense that the plaintiffs in error, or either of them, heard or knew anything of the statements claimed to have been made by Goshorn to the witness, and, at best, it was a self-subservient statement, made by the defendant in error, and which could not be used in his own behalf. Whart. Ev. (2d Ed.) § 1101; Tayl. Ev. § 523; Whitney v. Houghten, 127 Mass. 527; Duvall's Ex'r v. Darby, 38 Pa. St. 56; Scott v. Shelor, 28 Grat. 891, 895.

For these reasons, and without further discussing the assignments of error, the decision of the lower court is reversed, and the case remanded, with instructions to award a new trial therein. Reversed.