UNITED STATES v. MOTLOW et al.

(District Court, M. D. Tennessee. June 7, 1926.)

1. Criminal law ⬄242(7).

Evidence *held* insufficient to justify belief of probable cause and guilt of conspiracy to violate National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.), in violation of Penal Code, § 37 (Comp. St. § 10201), so as to warrant removal of defendants.

2. Criminal law ⬄242(5).

Certified copy of indictment, together with proof or admission of identity, makes out prima facie case on proceedings for removal.

3. Criminal law ⬄242(5).

Prima facie case for removal, by certified copy of indictment, with proof of identity, may

be rebutted by showing nonexistence of probable cause.

**4. Criminal law ⬤═242(7).**

Evidence affording ground for suspicion or conjecture that offense was committed, and that accused were probably guilty, is not sufficient to warrant order of removal.

**5. Criminal law ⬤═242(7).**

As to removal, lawful sale of whisky at price greater than its real value will not support inference that sellers were guilty of violation of Penal Code, § 37 (Comp. St. § 10201), because of conspiracy to violate National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.).

Removal proceeding by the United States against Lem Motlow and others, wherein defendants filed a petition for habeas corpus. Order of removal denied, and defendants discharged under writ of habeas corpus.

John Marshall, Asst. Atty. Gen., A. V. McLane, U. S. Atty., of Nashville, Tenn., and A. Ward, U. S. Atty., of Indianapolis, Ind., for the United States.

Seth Walker, of Nashville, Tenn., Lamb & Lamb, of Fayetteville, Tenn., Parks & Bean, of Lynchburg, Tenn., and Patrick H. Cullen, of St. Louis, Mo., for defendants.

GORE, District Judge. The defendants, Lem Motlow, T. A. Heffernan, Harry L. Dahlman, and 14 others, were indicted by the grand jury for the Eastern Division of the Eastern Judicial District of Missouri, on May 19, 1924, for violating section 37 (conspiracy to violate the National Prohibition Act [Comp. St. Ann. Supp. 1923, § 10138¼ et seq.]) of the Penal Code (Comp. St. § 10201). Capiases for the arrest of Lem Motlow, T. A. Heffernan, and Harry L. Dahlman were duly issued on the 19th day of May, 1924, and were soon thereafter executed by arresting them and taking them before a United States commissioner, where they executed their several bonds, conditioned upon their appearance before the District Court of the United States for the Eastern Division of the Eastern District of Missouri on the 17th day of September, 1924, etc. Said cause was continued from time to time, by the government, over the protest of defendants. Finally, over the protest of defendants, on the —————— day of April, 1926, the indictment was placed upon the retired docket and they were discharged on their bonds.

On October 31, 1925, the grand jury of the District Court of the United States for the District of Indiana, at Indianapolis, found and returned an indictment against Motlow, Heffernan, Dahlman, and some 36 other de-fendants, for violating section 37 of the Penal Code. Said indictment in Indiana is predicated upon the same facts upon which the indictment in Missouri was returned. Certified copy of the indictment at Indianapolis was forwarded to the United States district attorney at Nashville, who, on the 3d day of November, 1925, went before Hon. Harry A. Luck, United States commissioner at Nashville, and filed a complaint against defendants Motlow, Heffernan, and Dahlman, based upon said certified copy of said indictment, who, on said date, issued a warrant for their arrest, which went into the hands of the marshal for the Middle District of Tennessee, and on November 3, 1925, they surrendered themselves to said marshal, and were taken before said Hon. Harry A. Luck, United States commissioner, and executed bond for appearance before said commissioner at a later date. On December 7, 1925, a hearing was had before Commissioner Luck, to determine whether or not there was probable cause for the removal of said defendants to the jurisdiction of the District Court for Indiana, with the result that he was of opinion that there was no probable cause to believe either of the defendants, Motlow, Heffernan, or Dahlman, guilty of the charges contained in the indictment, and hence they were discharged.

On March 18, 1926, complaint was made by the assistant district attorney for the Middle District of Tennessee, before the judge of the United States District Court, sitting for the Middle District of Tennessee, at Nashville, charging that these three defendants, with others, had feloniously conspired to violate the National Prohibition Act, and filed a certified copy of the indictment from the United States District Court for the District of Indiana, and praying for warrant of arrest and judgment of removal to said District Court for the District of Indiana. Defendants surrendered themselves to the marshal, and then filed a petition for habeas corpus. The cause came on to be heard before me upon certified copy of the Indiana indictment and oral evidence offered by the government, and also by oral and documentary evidence of the defendants, together with oral argument and written briefs.

It was shown upon the hearing that prior to June 26, 1923, defendants Motlow, Heffernan, and Dahlman were the sole owners of the capital stock of the Jack Daniel Distilling Company, a Missouri corporation, with its situs and place of business in the city of St. Louis; that Motlow was the owner of 80 or 85 per cent. of the capital stock of said corporation, and Heffernan and Dahlman were

owners of the remainder of said capital stock; that the assets of said corporation consisted of some 895 barrels of whisky and 69 cases of whisky bottled in bond, in the warehouse of the Jack Daniel Distilling Company; that in all there were some 40-odd thousand gallons of whisky; that on June 26, 1923, one Don H. Robinson purchased the entire capital stock of the Jack Daniel Distilling Company, and then was turned over to him the warehouse certificates for the liquor in the warehouse. The consideration was paid in cash, and thereupon Mr. Motlow, Mr. Heffernan, and Mr. Dahlman resigned as directors and officers of the corporation, the stock certificates to them were canceled, and new stock certificates were issued to Mr. Robinson, and the books and minutes of the corporation were turned over to him, and other persons were elected as officers and directors.

After the sale and transfer, defendant Heffernan was about the warehouse for a few days—about a week—winding up the affairs of himself, Motlow, and Dahlman; but neither of the other defendants were about the warehouse until after the acts complained of as the basis of the indictment aforesaid were committed. At the time of the sale of the capital stock by Motlow, Heffernan, and Dahlman to Robinson, defendant Remus and others were present. The negotiations were held, and the transfers and all the papers were drafted and executed, in the law offices of Igoe, Carroll & Higg, in the city of St. Louis; Igoe, Carroll & Higg representing the purchasers, and Col. Frank P. Bond, of Nashville, Tenn., representing the sellers. Prior to the time of these negotiations and sale, the defendant Remus was engaged in the practice of law in Chicago, and enjoyed an extensive practice; but he had abandoned the practice of law, and was at that time engaged in the illegal traffic of whisky. In fact, he was at that time under conviction and sentence to the penitentiary from the United States District Court at Cincinnati, but these facts were not known to either Motlow, Heffernan, and Dahlman, or their attorney, Col. Bond. On the occasion of the preparation of the papers and the transfer of the stock, he also was appearing in the capacity of attorney for the purchaser, and there was nothing to indicate that he was one of the purchasers. His interest in the transaction appeared to be solely that of an attorney, and his conduct and participation on these occasions did not challenge attention or create suspicion that he was interested otherwise than as attorney for the purchasers. The sale of the stock was brought about by a broker in St. Louis by the name of Organ. The facts leading up to the sale and transfer of the stock were more or less accidental.

Since the passage of the National Prohibition Act, defendants had been selling their whisky to wholesale druggists in legitimate trade, at from $30 to $33 per case (three gallons making a case). Their overhead expenses were so great that it was not a profitable business, and defendants Heffernan and Dahlman were anxious to sell, and defendant Motlow had, upon advice of friends, become willing to sell. Mr. Organ, who was a broker in St. Louis, was looking for a location for a storage house for automobiles, and he accidentally came upon the building owned by Mr. Motlow, and used as the warehouse of the Jack Daniel Distilling Company, and learned that Mr. Motlow was the owner. He approached Mr. Motlow and proposed to rent the building. Mr. Motlow explained to him that it could not be rented, because it was being used as a "bonded warehouse" where whisky was stored, and in the course of the conversation Mr. Motlow expressed his desire to get out of the liquor business, when Mr. Organ told him that he might be able to find a buyer. Mr. Motlow fixed a price of $400,000 for the business and the warehouse. Mr. Organ went about to find a purchaser, and discussed the purchase of the business with a number of people. Subsequently Mr. Remus, whom Mr. Organ did not know, came to the office of Mr. Organ and stated that he was representing persons who would like to buy a distillery. Nothing very definite was accomplished upon the first visit of Mr. Remus to Mr. Organ, and Mr. Organ was not sufficiently impressed with the visit to remember his name. Mr. Remus stated to him that he, or the people whom he represented, owned other whisky, and were looking for a concentration warehouse in St. Louis. Mr. Remus visited Mr. Organ some two or three times, and finally authorized Mr. Organ to offer the owners of the distillery, Motlow, Heffernan, and Dahlman, $125,000 for the "stock of the corporation." This offer was later communicated to Motlow, Heffernan, and Dahlman by Mr. Organ, which was finally accepted by them; they agreeing to accept the $125,000, net, and the purchaser to pay Mr. Organ's commission of some $6,000. When the parties met in the offices of Igoe, Carroll & Higg, on June 19, to draw up the agreement of sale ("an executory contract"), the sellers did not know who the purchaser or purchasers were. They had never seen nor heard of them.

In the sale of the capital stock of the distilling company to Mr. Robinson, Mr. Motlow leased the Jack Daniel Distilling Company his warehouse for the sum of $500 per month, rent to be paid monthly in advance, and he required of the lessee a bond in the sum of $90,000, conditioned to hold him harmless in the event the property should be confiscated to the government because of any violations of the laws of the United States in relation to the storage or disposition of the whisky stored therein. Mr. Motlow also contracted to sell him certain liquors which he owned individually, then stored in warehouses in Cincinnati, Ohio, and Birmingham, Ala., at the price of $3 and $5 per gallon, respectively; this liquor to be transferred at the expense of Mr. Motlow to the concentration warehouse of the Jack Daniel Distilling Company in St. Louis.

Col. Bond, as attorney for Mr. Motlow, Mr. Heffernan, and Mr. Daniel, went next day to the office of the collector of internal revenue in St. Louis, and notified the proper authorities of the sale of the capital stock of the distilling company to Mr. Robinson. Mr. Meininger, the vice president of the new organization, was selected by resolution on the minutes, as the party authorized and qualified to sign papers for the Jack Daniel Distilling Company, and a copy of this resolution was sent the collector of internal revenue at St. Louis, and Mr. Meininger became the active manager in charge of the distilling company after that date. While the papers transferring the stock were being prepared, Mr. Robinson and others of his associates, together with Mr. Dahlman, went to the warehouse and investigated the contents to determine whether or not the amount of liquor was there as represented by the sellers.

The sale of the liquor owned by Mr. Motlow and stored at Cincinnati and Birmingham was never perfected, and the liquor was never transferred to the concentration warehouse at St. Louis, although Col. Bond made as many as two trips to Washington to confer with the officials of the Internal Revenue Department for the purpose of expediting the transfer of the liquor to the concentration warehouse at St. Louis; but this transfer was never made because the new owners of the capital stock failed to make certain repairs on the warehouse before the Commissioner of Internal Revenue would permit the whisky to be removed there, and they failed to execute the proper transportation and warehousing bonds. Petitioners, through their attorney, Col. Bond, made repeated requests upon Mr. Meininger to have the building repaired so that the spirits might be transferred. He even went so far as to prepare transportation and warehousing bonds, as required by law, and sent them to Mr. Meininger to be executed. In the meantime the rents due Mr. Motlow for the warehouse were not paid, and diligent efforts were made by himself, through Col. Bond, to collect them, and quite a voluminous correspondence appears in the record, but no rents were paid whatever, and the transportation and warehousing bonds were never executed. Some of these letters, one at least, was registered to the Jack Daniel Distilling Company in St. Louis, Mo., but it brought forth no reply.

Counsel for the government sum up its contentions and reasons why the defendants should be required to appear and defend the case against them in the District Court for the District of Indiana, at Indianapolis, in one paragraph in their printed brief, as follows:

"We submit that the return of an indictment against the defendants by two different grand juries, and the fact that it is undisputed by the evidence that Motlow, Dahlman, and Heffernan were dealing with Remus, Meininger, and other conspirators, and in fact sold them $30,000 worth of whisky for which they received $125,000, and the fact that although they took a pretended lease back on the warehouse providing for a monthly rental of $500, with a forfeiture clause therein, no effort was ever made to forfeit the lease, obtain possession or collect the rent, other than such effort as was made by Judge Bond, who, of course, may have been in good faith, and Motlow may have requested him to write the letters which it is shown he did write, and the further fact that a $90,000 bond was given by the conspirators to Motlow, and no effort has been made to recover thereon for the admitted violation of the revenue law in removing the liquor from the bonded warehouse, all seem to unite in justifying the court to conclude that there was at least probable cause for the return of the indictment, and that the removal should be ordered."

[1-4] I cannot agree with counsel for the government that the facts shown in the record are sufficient to justify me in holding that there is probable cause to believe the defendants, Motlow, Heffernan, and Dahlman guilty, and justify an order of removal. It is true that the certified copy of the indictment, together with proof, or admission of identity, makes out a prima facie case; but this prima facie case can be rebutted, and the defendants have a right to show the nonexistence of probable cause. The prima facie case made by introduction of the indictment and identity of

the defendants is not conclusive, and the court may, in its discretion, require further evidence. Even if the evidence should afford ground for suspicion or a conjecture that the offense was committed and that the accused are probably guilty, still it is not of itself sufficient to warrant the court in making the order of removal. In the case of Beavers v. Henkel, 194 U. S. 73, 24 S. Ct. 605, 48 L. Ed. 882, Mr. Justice Brewer, speaking for the court, uses the following language on page 83 (24 S. Ct. 606):

" * * * It may be conceded that no such removal should be summarily and arbitrarily made. There are risks and burdens attending it which ought not be needlessly cast upon any individual. These may not be serious in a removal from New York to Brooklyn, but might be if the removal was from San Francisco to New York, and statutory provisions must be interpreted in the light of all that may be done under them. We must never forget that in all controversies, civil or criminal, between the government and an individual, the latter is entitled to reasonable protection. Such seems to have been the purpose of Congress in enacting section 1014, Rev. Stat. [Comp. St. § 1674], which requires that the order of removal be issued by the judge of the district in which the defendant is arrested. In other words, the removal is made a judicial rather than a mere ministerial act."

The case of United States v. Green (D. C.) 136 F. 618, opinion by District Judge Ray, which was affirmed by a per curiam opinion in 199 U. S. 601, 26 S. Ct. 748, 50 L. Ed. 328, is illuminating upon the subject, and is ample authority for the position I take in this case. Judge Ray, in discussing the evidence, on page 625, makes the following statement:

" * * * Standing alone and unsupported by the indictment, the evidence given is insufficient to show the commission of the crime by Green or establish probable cause." And on page 627 he says: " * * * The defendant in a criminal case is presumed to be innocent until proven guilty, and this presumption obtains in favor of a defendant accused by the government of the United States to the same extent and with the same force as when the accusation is made by an individual. This presumption of innocence obtains in a proceeding of this character. The government is not under obligation to establish a case beyond a reasonable doubt, or beyond a doubt establish cause for believing that a crime has been committed and that the defendant is guilty of such offense. However,

suspicion, guess, surmise, conjecture, and speculation, with some evidence as a basis, do not establish probable cause in the eye of the law. The evidence must point to crime and indicate the defendant as the probable criminal. 'Probable cause is the existence of such facts and circumstances as would excite the belief in a reasonable mind, acting on the facts within the knowledge of the prosecutor, that the person charged was guilty of the crime for which he was prosecuted.' Wheeler v. Nesbitt et al., 24 How. 544, 16 L. Ed. 765. 'Probable cause, as defined in the books, is such a state of facts and circumstances as would lead a man of ordinary caution and prudence, acting conscientiously, impartially, reasonably, and without prejudice upon the facts within his knowledge, to believe that the person accused is guilty.' Heyne v. Blair, 62 N. Y. 22. See, also, Bacon v. Towne, 4 Cush. 217; Carl v. Ayers, 53 N. Y. 14; McGurn v. Brackett, 33 Me. 331. 'It is a reasonable ground for believing a person guilty; such reasons and such circumstances as would be satisfactory and convincing to right reason.' Wanser v. Wyckoff, 9 Hun, 178. See, also, Anderson v. How, 116 N. Y. 336, 22 N. E. 695; Wheeler v. Nesbitt, 24 How. 544, 16 L. Ed. 765; Lacy v. Mitchell, 23 Ind. 67; Hays v. Blizzard, 30 Ind. 457; Driggs v. Burton, 44 Vt. 124; Mitchell v. Wall, 111 Mass. 492; Harpham v. Whitney, 77 Ill. 32. There is no reasonable ground for believing a person guilty of a crime, when the only fact proved is just as consistent with his innocence as with his guilt. There is no probable cause to believe a crime has been committed, when the only fact shown is as consistent with the nonexistence as the existence of a crime. * * * "

There is not an iota of proof in the record that either of these three defendants had any connection with the violations complained of, except I surmise or guess that they sold the capital stock of the Jack Daniel Distilling Company to their codefendants for the purpose of enabling them to steal the whisky therefrom, and sell it in violation of the law, and except for the prima facie case made by the indictment. The fact of the sale can be explained as "consistently" (and with even greater consistency) with their innocence than with their guilt. The proof does not show that they had any connection with either of the codefendants in any way subsequent to the date of the transfer, except through their attorney, Col. Bond, and that was for the legitimate purpose of having the purchasers execute the required transportation and warehousing bonds and repairing

the warehouse for receipt of the whisky belonging to Motlow in Cincinnati and Birmingham, and paying monthly rents on the warehouse. They never received a penny for any whisky that was sold, nor did they pay any of the expense of removing the whisky from the warehouse and transporting it to Indiana, Cincinnati, and other places.

[5] Counsel for the government also insist that the liquor was worth only $30,000, when, as a matter of fact, they received $125,000 for it. This contention is not supported by sufficient evidence to establish it as a fact. The evidence is that the whisky brought $2.72 or $2.73 per gallon; and that it was reasonably worth that amount on the date of the sale. The government introduced a Mr. Henson, Special Agent for the Intelligence Department, Department of Justice, who testified on original examination that the liquor was worth only $1 per gallon, on the date of sale; but on cross-examination he stated that he knew of no Jack Daniel liquor being sold on the market, and certain price lists, which were exhibited, showed that the whisky was priced considerably higher than $1 per gallon. But, even if it should be conceded that the whisky was sold at a price greater than its real value, I cannot infer guilt from this fact. Motlow, Heffernan, and Dahlman state that the whisky was worth the price received for it.

Counsel for the government also insist that the fact that Mr. Motlow rented the premises to the new owners of the Distilling Company for monthly rental of $500, and never made effort to forfeit the lease upon nonpayment, other than through his attorney, Col. Bond, is a circumstance of guilt; but I cannot accept this conclusion of counsel. I have read the entire record, and am constrained to the opinion that Mr. Motlow was acting in the utmost good faith in attempting to collect the rentals, and Exhibit 38 to the deposition of Col. Bond is a letter written by him to Jack Daniel Distilling Company, 3960 Duncan avenue, St. Louis, Mo., September 21, 1923, in which he says: "Mr. Lem Motlow directs me to demand of you payment for rental on the building at 3960 Duncan avenue, which he leased you, which is now three months in arrears. An examination of the lease will disclose to you that nonpayment of rent works a forfeiture. Unless the matter is given immediate attention, I shall take action to forfeit the lease, go to Washington, and lay the whole matter before the department, to the end that Mr. Motlow may get possession of his house and secure payment of his rents out of the contents therein. I am reluctant to do this, but your failure to pay attention to my letters constrains me to write you as above."

And Col. Bond also, on August 30, wrote to Mr. Vance G. Higg, of Igoe, Carroll & Higg, attorneys for the purchasers, demanding rents, then amounting to $1,500, and threatening to report their failure to pay rents to the Revenue Department at Washington, and obtain permission from the department to institute forfeiture proceedings; and in another letter under date of September 6, to Mr. Higg, Col. Bond informs him that he proposes to institute proceedings in the federal court at St. Louis for possession of the warehouse. On September 20, Col. Bond wrote to Hon. R. A. Haynes, Prohibition Commissioner, Washington, D. C., attention Mr. Doran, a detailed statement of the actions of the new owners of the distilling company; their refusals to reply to his letters; his visit to St. Louis to see them, and inability to do so; their refusals to execute the transportation and warehousing bonds to remove the whisky from Cincinnati and Birmingham to St. Louis; and also their failure to pay rents. This letter was acknowledged by Commissioner Haynes September 24. On September 25, Col. Bond wrote to defendant Dahlman at St. Louis, in which he says: "Lem asked me to request you to inquire about the guards about the distillery warehouse, and advised him to see the collector or some official at his office, and advise them of the valuable property of Mr. Motlow located in the warehouse, which needed the protection of guards."

This correspondence shows the absolute good faith of petitioners, and that they were not concealing anything from the government, which disproves any participation in a conspiracy or participation in the robbing of the warehouse. I have read a copy of the transcript of the record in the case of Edward J. O'Hare et al. v. United States, in the Circuit Court of the United States for the District of Indiana, which is the indictment under which these defendants are now sought to be removed to Indiana, which was filed as part of the record in this hearing, and I do not recall that the names of Dahlman and Heffernan were mentioned in that proceeding, and the name of Motlow only two or three times, and that was only incidentally. There was no incriminating evidence against these three defendants offered on the trial of that cause. Defendants Remus and Boyd testified orally before me, and they nowhere make any statement which as much as casts a suspicion of guilt upon these three defendants.

Counsel for the government recognize the weakness of their case, and virtually concede that the facts are not sufficiently strong to warrant the court in making the order of transfer, by the use of the language in their brief that the facts shown by the evidence in the case "all *seem* to unite in justifying the court to conclude that there was *at least* probable cause for the return of the indictment, and that the removal should be ordered." (Underscores mine.) It is not sufficient that the facts *seem* to justify the court to conclude that there was *at least* probable cause, but the court should be persuaded from the evidence of the probable guilt of defendants, and not rest satisfied merely with remote possibilities. To do so might work a very grave hardship and injustice upon a citizen, such as the Supreme Court, in the case of Beavers v. Henkel, supra, has said should not be done. A review of the evidence, aside from and independent of the indictment, does not cast, as I view it, even a suspicion upon the defendants, nor does it give ground for guess, surmise, or conjecture that these three defendants were implicated in the conspiracy to rob the warehouse. It results that the order of removal is denied, and the defendants will be discharged under the writ of habeas corpus.

I do not decide the question, raised by the petition for habeas corpus, that holding of the case in St. Louis, in the manner set out in the petition, works a discharge of the defendants, because in violation of their constitutional rights to a speedy trial. It is not necessary for me to decide this question, because any order that I might enter would not be binding upon the District Court at Indianapolis, and, even if I should find that the defendants are entitled to a verdict of not guilty under the indictment, in the District Court at St. Louis, because they have been denied the privilege of a speedy and public trial in the District Court at St. Louis, as guaranteed under the Fifth Amendment to the Constitution of the United States, and that violation of that constitutional right debars the government from prosecuting them in the District Court at Indianapolis, or that the government has waived its right to prosecute them in either the St. Louis or the Indianapolis court, and should enter an order accordingly, such order would not be binding upon either of said courts; hence it would be unavailing to the defendants. All I am deciding is that the evidence, taken in consideration with the certified copy of the indictment, fails to make out a case of probable cause of guilt or criminal participation of either of these defendants in the commission of the offenses alleged in the indictment.